UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SQUARE D COMPANY,

        Plaintiff,

   v.                                                                Case No. 04-C-775

JAMES VAN HANDEL and
MAGNETECH INDUSTRIAL SERVICES, INC.,

        Defendants.

## DECISION AND ORDER

Plaintiff Square D has moved for a preliminary injunction seeking to enforce the terms of defendant James Van Handel's employment agreement, which contained a non-compete clause. It also seeks to enjoin Van Handel from revealing what Square D views as trade secrets and other propriety business information. Following a hearing and after consideration of pre- and post-hearing briefing, I conclude Square D has failed to establish a sufficient likelihood of ultimate success on the merits as to either claim to warrant the preliminary relief it seeks. I also conclude the evidence is insufficient to establish Square D would suffer irreparable harm or that it's remedy at law is inadequate. For those reasons, the motion for a preliminary injunction will be denied.

## I. BACKGROUND

Defendant James Van Handel was formerly a field service operations manager for plaintiff Square D's Appleton office, which covers northern Wisconsin and Minnesota. When he became an employee of Square D following its acquisition of a company in which he was a shareholder, he

signed an agreement to the effect that he would not compete with Square D for two years following either his resignation or his termination for "just cause," which is defined, as relevant here, as a "willful failure or refusal to perform the duties and responsibilities of your position." He also agreed not to reveal customer information or price lists.

Square D claims that Van Handel was terminated for just cause on March 31, 2004, because of his willful failure or refusal to perform various duties and responsibilities of his position. Specifically, Square D contends that it terminated Van Handel's employment for cause based on the following misconduct:

1. refusal to address chronic misconduct and performance deficiencies of his office manager;

2. failure to meet customer deadlines;

3. failure to provide his supervisor with complete and accurate information regarding customer projects in the backlog;

4. closed the Appleton office for a minor league baseball game;

5. approved the purchase of a "printer plotter" for $4,000 which he charged to a customer account in violation of company policy;

6. made unauthorized purchases of cellular phones and enlisted in unapproved two-year provider contracts without prior approval; and

7. failed to conduct required monthly safety audits and failed to complete any of the online safety courses the company required to ensure that his subordinates did so as well.

(Pl.'s Post-Hrg. Mem at 7-8.)

Soon after being terminated, Van Handel approached Magnetech, a competitor, about working for them. In a memo dated April 7, 2004, Van Handel described to Magnetech various sales leads he had developed at Square D, apparently as an enticement for Magnetech to hire him. Magnetech did hire him on April 12, 2004 as a service center manager for the Appleton district.

Magnetech has since fired Van Handel for poor performance, after which it discovered a binder in his office containing Square D documents, including price lists. Magnetech also discovered that, while still in its employ, Van Handel had devised a strategy to purchase a firm on his own, Van Handel ETS, LLC (ETS), and compete with both Magnetech and Square D in the northeastern Wisconsin market. These facts serve as the basis for a cross-complaint filed by Magnetech against Van Handel. Magnetech now supports Square D's request for an injunction against Van Handel, but claims it has satisfied all of Square D's concerns about its own activities related to the confidential information at issue. Square D has not pressed its injunctive claims against Magnetech.

## II. ANALYSIS

**1. Preliminary Injunction Standards**

As the parties are aware, motions for preliminary relief invoke the court's powers in ways much different than the typical civil case. Indeed, some courts have deemed such relief to be "extraordinary." *Indiana Civil Liberties Union v. O'Bannon,* 259 F.3d 766, 770 (7th Cir. 2001). In essence, such motions ask for immediate relief to preserve the status quo pending a full adjudication on the merits. In many cases, including this one, substantial amounts of evidence are proffered and the parties have the opportunity for thorough briefing of the issues. The movant must make an initial showing (1) that his case has a likelihood of success on the merits; (2) no adequate remedy at law exists; (3) he will suffer irreparable harm if the injunction is not granted, and also that that harm outweighs the irreparable harm the respondent will suffer if the injunction is granted; and (4) the injunction will not harm the public interest. *Joelner v. Village of Washington Park, Illinois,* 378

3

F.3d 613, 619 (7th Cir. 2004). Then, if the movant can meet that threshold burden, the inquiry becomes a "sliding scale" analysis where these factors are weighed against one another. *Id.*

**2. Enforcement of the Non-compete Clause**

The central question underlying Square D's likelihood of success on the merits in its effort to enforce the non-compete clause is whether Van Handel was terminated for just cause. If not, the terms of the non-compete provisions of his employment agreement do not apply. To recall, the agreement defines just cause as a "willful failure or refusal to perform the duties and responsibilities of your position." Though the agreement itself defines "just cause," the term is not, of course, a novel phrase hitherto unknown to employment contracts, and we therefore need not interpret its definition in a vacuum. *See Kernz v. J.L. French Corp.*, 667 N.W.2d 751, 756-57 (Wis.App.2003). "Just cause" is a term designed to distinguish a particular employment relationship from the standard "at will" relationship in which an employer is free to terminate an employee for any reason whatsoever, as long as it is not based on a prohibited form of discrimination or other reasons not relevant here. *See Ferraro v. Koelsch,* 368 N.W.2d 666, 668 (Wis. 1985)(employer's adding of "just cause" termination provision to employee handbook created contract altering at-will employment relationship).

Care must be taken to avoid an overly narrow reading of the agreement's definition of just cause. Because Van Handel has admitted to several of the infractions cited above, and because he has not really claimed that all of those actions were accidental or simply negligent, they could be deemed "willful" failures to perform the duties of his position. While it is undoubtedly true that some of Van Handel's actions were "willful" in a literal sense, to adopt such a narrow interpretation would allow termination for even the most trivial missteps, as long as those missteps were not

4

accidental. That cannot be what the agreement means. Suppose Van Handel had deliberately left work five minutes early one day; would that constitute a "willful failure or refusal to perform [his] duties and responsibilities"? Probably not. Indeed, Square D implicitly recognizes this when it argues that Van Handel's actions should be viewed in the aggregate rather than in isolation, an apparent concession that willful failures to perform cannot relate to small, seemingly inconsequential duties, but must implicate *material* duties and responsibilities. Dan Foust, Square D's Midwest Region Services Operations Manager at the time and its principal witness on the termination, gave explicit recognition to this aspect of the issue when he acknowledged that Van Handel would not have been terminated for failing to conduct a safety audit for the month of February, 2004. (Tr. 322-23.) The very use of the term "just" to qualify the "cause" required for termination suggests that not only must the transgression be willful, but it must be somehow proportional to the consequence the employer seeks to impose.

Do Van Handel's actions, then, fall into that category? Courts often repeat the obvious apology-cum-warning that they are not "super-personnel boards" sitting in painstaking judgment over the minutiae of hirings, firings, promotions, demotions and miscellaneous workplace slights. *Guerrero v. Ashcroft,* 253 F.3d 309, 314 (7th Cir. 2001). Yet a judgment must be reached somehow. Here, the determination of just cause requires a weighing of the evidence presented within the context of the contractual language and the nature of the employment relationship itself. Applying the foregoing principles to the facts before me, I find the evidence too uncertain as to whether Van Handel's conduct amounts to just cause for termination of his employment to support Square D's request that he be enjoined from soliciting business from any Square D customer with whom he had contact while at Square D.

5

It is significant that Square D did not specifically tell Van Handel that he was being discharged for cause at the time it terminated his employment. Given the terms of the employment agreement, this issue was crucial to both parties. Yet, only Van Handel seems to have made any effort to clarify the issue at the time of his discharge. Van Handel was informed of his termination at a meeting in his office with Foust and Matthew Dobransky, a Square D Human Resources Representative, on March 31, 2004. According to Van Handel, Foust and Dobransky arrived in his office, closed the door and told him they were there to terminate his employment. (Tr. 188.) They told him "there had been some issues in the past and that they had come to make a decision that it was time for a change in leadership in Appleton." (Tr. 189.) When Van Handel asked if there was a specific event that led to his discharge, Dobransky put his hand up to stop Foust from answering and stated, "No. We are only making a change in leadership." (*Id.*; Tr. 191.) Van Handel asked if he would receive anything in writing, and Dobransky told him there was no need to put anything in writing. (Tr. 189.) In a further effort to find out if his discharge was for cause, Van Handel asked if Square D intended to challenge his right to unemployment compensation. Dobransky told him he would be eligible and, at Van Handel's request, gave him his direct telephone number in case he had trouble getting unemployment benefits. (Tr. 189-90.) Then, as he began packing his personal belongings, Dobransky removed the employment contract from his briefcase and asked Van Handel if he knew what was in it. Van Handel said he did, completed packing his personal belongings, and left the office. (Tr. 190.)

Foust, on the other hand, testified that when he first began considering Van Handel's termination, he was not even aware of the specific terms of the employment agreement. (Tr. 299-300.) Although he later became aware of the agreement, he still had not read its terms as of March

6

31, 2004, when he advised Van Handel he was terminated. (Tr. 302-303.) Foust testified there was no doubt in his mind he conveyed to Van Handel that his termination was for performance. (Tr. 302.) Yet, he could not recall whether Dobransky had stopped him from answering Van Handel's question as to why he was being terminated, though he acknowledged it may have happened. (Tr. 323-24.) And although he thought there was some brief conversation about the reasons for Van Handel's discharge, he could not recall the exact words. (Tr. 323.)

Dobransky likewise testified that Foust told Van Handel he was being terminated "for performance." (Tr. 386.) But when Van Handel asked what the reasons were for his termination, Dobransky admits that "at that point we said we're not going to discuss that." (*Id.*) Despite their reluctance to tell Van Handel the specific reasons for his discharge, Dobransky testified that he did give Van Handel "just the very broad general reasons of why he was being terminated for such things as mismanagement of employees and the safety training issues, failure to comply with company policies, those type of issues." (Tr. 387.) However, Dobransky could not recall discussing with Van Handel his eligibility for unemployment, and despite his desire to make sure Van Handel knew about his obligations under the employment agreement, he made no mention of the non-compete provision after Van Handel assured him he knew what his obligations were. (Tr. 388-90, 397-98.)

Given the terms of the employment agreement, it is strange that neither Foust nor Dobransky told Van Handel that he was being terminated for "just cause" and provided him a statement of reasons if Square D intended that he be bound by the non-compete provision. The exact words "just cause," of course, were not necessary, but had they wanted to make doubly sure Van Handel would abide by the non-compete clause, that information would have been crucial. Whether he spurned

7

their attempts to discuss the contract during the termination meeting or not, some further communication about the reason for his termination would have made things clearer. Square D has offered no explanation as to why it chose not to explicitly spell out its reasons in writing at the time it notified Van Handel he was terminated. The fact that it did not do so gives its present explanation many of the earmarks of an ex post facto reconstruction of events.

In truth, many of the infractions now cited by Square D are scattered and seem fairly picayune. Van Handel's decision to close the office for an afternoon so they could attend a baseball game, for example, was made in response to an invitation from a Square D Strategic Account Manager. Mike Bukavitz, who handled the Square D account for Kimberly-Clark Corporation, had been authorized by his supervisor at Square D to take the entire Appleton service shop and their families to a picnic lunch and baseball game in appreciation for the work they had done in various Kimberly-Clark locations around the country. Van Handel accepted the invitation, but instructed his staff to take their cell phones with them so they would be able to respond to any customer calls. He also arranged for the answering service to notify any customers that called that no one was in the office but that they were available on their cell phones. In fact, no customers reported any problem as a result of the office being closed that afternoon. (Tr. 185-86.)

Square D is certainly entitled to criticize Van Handel's decision to accept Bukavitz's invitation and close the office for an afternoon. It could take the position that the benefit to employee morale from such outings is outweighed by the potential damage to customer relations and prohibit its managers from closing the office for such events. But absent a specific policy or directive instructing its field service operations managers not to accept such an invitation, Van Handel's decision cannot be fairly characterized as a "willful failure or refusal to perform the duties

8

and responsibilities of [his] position." And the fact that Bukavitz, with his boss's approval, extended the invitation to the Appleton office strongly suggests that Square D had no such policy at the time Van Handel made his decision.

The incidents involving the purchase of the printer/plotter and the cell phone contract are also of questionable significance. The printer/plotter, which cost $4,000, was requested by a Square D Services Sales Engineer to save time on a project that was spent going back and forth to a print shop every time they made changes on the prints. After speaking to others within the company, Van Handel authorized the purchase as an expense on that project. He was later told by accounting that the item should have been handled through a capital request instead of a purchase order on a particular job. Van Handel was required to obtain authority for capital expenditures exceeding $2,000, and thus violated company policy by authorizing the purchase. (Tr. 182-84, 284) But as even Foust conceded, Van Handel may not have appreciated the significance of the distinction as it applied to this purchase. (Tr. 342.)

The cell phone contract incident concerned Van Handel's failure to obtain prior approval before renewing the cell phone contract for his office with Alltell Corporation. Alltell was not one of Square D's preferred providers and thus Van Handel should have obtained prior approval from corporate headquarters before renewing the contract. In addition, Van Handel exceeded his authorization by $400 in purchasing cell phones and related equipment from the vender. (Tr. 289-90.) The evidence also shows, however, that outside venders were authorized when a preferred provider was unable to provide the proper coverage, and Alltell had been approved two years earlier because Square D's preferred venders did not have sufficient coverage in northern Wisconsin. (Tr. 177.) As to exceeding his spending authorization, Van Handel testified that the cost of the cell

9

phones was within his authority, but when the "hands-free" kits he ordered were added, he exceeded his spending authority by $400, which Van Handel admitted was a mistake. (Tr. 177-78.)

Square D contends these incidents are reflective of Van Handel's consistent failure to comply with corporate policies and procedures and his constitute and willful failures or refusals to perform the duties and responsibilities of his position. But the record falls short of demonstrating the kind of frequent or significant violations of company policy that would support such a conclusion. Mistakes, even dumb mistakes, are not willful. Were these things material components of his job as an operations manager? One rather gets the sense that management, after "just cause" became an issue, reached back into their memories to recall anything that Van Handel did not do perfectly or any event in which his judgment might be questioned. Moreover, the safety infractions Square D now finds "most distressing" suggest that it protests too much. For if completion of the on-line safety courses were truly such a high priority, why did Square D let Van Handel skirt the rules for so long?[1]

The above are merely a few impressions of the evidence gleaned from the briefs, the documentary evidence and the hearing. I am mindful that I am not called upon to decide definitively whether Van Handel was terminated for just cause, but merely to judge Square D's likelihood of success on the merits should this case proceed to a full disposition. At this stage, and with this evidence, I simply am unable to find the weight of evidence in Square D's favor sufficient to justify the extraordinary relief that it seeks. Since that finding is crucial to Square D's right to enforce the

---

[1]Van Handel makes the argument that we should also consider the positive aspects of his employment, such as the fact that he exceeded financial goals, etc. If true, however, such evidence cuts both ways. It indicates that Square D had little reason to fire him and therefore must have had very good cause (such as malfeasance) for doing so.

10

non-compete clause, I conclude that Square D's motion to preliminarily enjoin Van Handel from competing with Square D must be denied.[2]

The other preliminary injunction factors support the same conclusion. Although Square D contends that Van Handel's conduct will cause irreparable harm, its argument is mostly speculative. Square D has offered little evidence of actual harm it has suffered, despite the fact that Van Handel has been soliciting its customers, first on behalf of Magnetech and now on behalf of his own firm, since April of 2004. According to Magnetech's First Amended Crossclaim against Van Handel, its Appleton office "failed miserably" under Van Handel's direction. (Docket #71 ¶ 15.) "In the six month April-September period, the office had sales of less than $100,000 and expenses exceeding $200,000." (*Id.*) This was the time, when Van Handel first left Square D and his knowledge of prices and customer prospects would have been fresh, that his ability to "steal" Square D business should have been greatest. Yet, it appears that Magnetech benefitted little from his efforts.

It is also significant that under the terms of the agreement, Van Handel was prohibited from soliciting Square D customers for a period of two years. More than half that time has already expired. Some of the delay, to be sure, was due to the parties unsuccessful effort to mediate the dispute. While the parties should certainly be commended for their efforts to resolve their dispute in this way, the fact remains that the passage of time has made the requested relief less urgent. *See Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 903 (7th Cir. 2001) ("Delay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable harm if a preliminary injunction is not entered."). Given the time that has already elapsed and the

---

[2]Van Handel has also argued that the non-compete clause is unenforceable because it is an unreasonable restriction on his ability to pursue his business, though he does not press this argument in his post-hearing briefing. In any event, because I deem it unlikely that the non-compete clause applied to him at all, I need not decide whether the clause is unreasonable.

11

relatively short period of time Van Handel would remain under the prohibition, I do not find that Square D would suffer irreparable harm if its request for injunctive relief was denied.[3]

Finally, whether Van Handel is crying "crocodile tears" or not, as Square D suggests, I am mindful that he is one individual trying to make a living. Further proof might show that he has done business unfairly, in which case he will have to disgorge some of his profits. But balancing between the harm to Square D and the harm to Van Handel, I find the harm to Van Handel thoroughly outweighs any harm to Square D.[4] After all, if Square D is convinced of its case, Van Handel at this point is simply making it money that he will have to give up at some future date. Thus, I do not find Square D has shown an inadequate legal remedy nor that any harm it might suffer will be irreparable. Accordingly, because all of the factors to be considered in deciding a motion for a preliminary injunction support Van Handel, Square D's motion, as it regards the non-compete clause, will be denied.

**3. Trade Secrets**

The second component of Square D's motion is its claim that Van Handel has misappropriated its trade secrets, specifically: (1) confidential information regarding specific

---

[3] Square D also argues that the two year period set forth in the agreement should run from the date of the injunction. If Square D ultimately prevails, it will be awarded damages for any losses it suffered as a result of Van Handel's violation of the restriction. It makes no sense to both award Square D damages for lost business during the period prior to issuance of an injunction and then extend the time period during which the restraint is to remain valid. Moreover, the reason for a two-year limitation on the restriction is to protect the employer during the time when the risk of unfair competition is greatest. Extending the restriction offers protection when it is no longer needed.

[4] Square D argues that because of Van Handel's precarious financial position and the amount of debt he incurred from his purchase of ETS, he is unlikely to pay any judgment ultimately entered against him. Under the circumstances, I find Square D's uncertainty over whether it could collect a judgment later outweighed by the certain destruction of Van Handel's business now.

12

customer proposals and pricing matters, and (2) confidential price lists, including applicable multipliers. Square D identified approximately six pages out of several hundred from a "resource book" found in Van Handel's office at Magnetech that it claimed constituted trade secrets or proprietary information that should not have been retained by Van Handel when he left his employment. The entire "resource book," which includes resource materials Van Handel has accumulated over the years even prior to his employment with Square D, was confiscated by Magnetech at the time it terminated Van Handel's employment on December 10, 2004. Van Handel does not claim any right to the specific pages identified by Square D, and thus the return of that information is not before me. (Tr. 468.) However, Square D also seeks to enjoin Van Handel from relying on, utilizing, or communicating its confidential pricing information and customer proposals. Square D contends that this information constitutes trade secrets under Wisconsin law and argues that "Van Handel cannot help but to use the information he acquired while a Square D employee to the benefit of Van Handel ETS." (Pl.'s Post Hearing Mem. at 20.) Citing *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir. 1995), Square D suggests that Van Handel should be enjoined from soliciting Square D customers for that reason alone.

> Under Wisconsin's Uniform Trade Secrets Act (UTSA),
>
> "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique or process to which all of the following apply:
>     1. The information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>     2. The information is subject of efforts to maintain its secrecy that are reasonable under the circumstances.

Wis. Stat. § 134.90(1)(c); *ECT Intern., Inc. v. Zwerlein,* 597 N.W.2d 479, 481 (Wis. Ct. App.1999).

13

Price lists are not, as a matter of law, protected as trade secrets. *Gemmy Industries Corp. v. Chrisha Creations Ltd.,* 2004 WL 1406075, * 12 (S.D.N.Y). *See also Tactica Int'l, Inc. v. Atlantic Horizon Int'l, Inc.*, 154 F.Supp.2d 586, 607 (S.D.N.Y.2001) (information the plaintiff sought to claim as trade secret-- information concerning the references of its customers--could easily be recalled by the defendants or obtained by contacting the customers directly and was not a trade secret). Although the Wisconsin Supreme Court has held that a customer list can constitute a trade secret under the Uniform Trade Secrets Act, *Minuteman, Inc. v. Alexander*, 434 N.W.2d 773, 777, 779 (1989), no Wisconsin court has held that a price list is entitled to such protection.

There is good reason to question whether pricing information should be granted such protection except in extraordinary circumstances. Treating pricing information as a protected trade secret, for example, significantly increases the power of the employer over those employees involved in sales by making it more difficult for employees to change jobs within a particular industry. As the Wisconsin Court of Appeals noted in *ECT Int'l*, a case both parties cite in support of their respective positions, "[a]ny overly restrictive provisions prohibiting a former employee from making use of or relying upon his or her independent recollections of generalized technical information learned from a prior employer could severely impede employee mobility and undermine the competitive basis of our free economy." 597 N.W.2d at 484, n.4. Here, for example, Square D suggests that Van Handel should be enjoined from working for a competitor because he cannot help but use the knowledge he has of Square D's confidential pricing policies to the benefit of his new employer, even though he no longer has any Square D documentation. If Square D is right, then it had no need for a non-compete provision in its agreement with Van Handel, for the protection accorded trade secrets under the UTSA would prevent him from using his knowledge of

14

Square D's pricing policies to solicit any customer, not just those with whom he had contact while at Square D. *See Bayer Corp. v. Roche Molecular Systems, Inc.*, 72 F. Supp.2d 1111, 1120 (S.D. Cal. 1999) (theory of inevitable disclosure of trade secrets can create a de facto covenant not to compete). But while trade secret law is intended "to protect standards of commercial morality and encourage invention and innovation, ... [it] should not prevent workers from pursuing their livelihoods when they leave their current positions." *PepsiCo*, 54 F.3d at 1268 (internal quotes omitted). This concern for employee mobility is even greater where, as in this case, the employee was involuntarily terminated.

In most cases, it would seem, pricing information will be readily ascertainable by other persons who can obtain economic value from its use. Customers who pay for the goods or services at issue, for example, would normally have an interest in disclosing the prices of competing bidders so as to force suppliers to engage in true competition for their business. Where that is the case, pricing information will not constitute a trade secret. For this reason, and given Wisconsin's strong public policy favoring employee mobility, *Farm Credit Services v. Wysocki*, 627 N.W.2d 444, 447 (Wis. 2001), it is unlikely that a company's pricing information will be found entitled to trade secret protection except in extraordinary cases.

Van Handel's main focus in this case, however, is not on the nature of the information, but on the second part of the definition of "trade secret," i.e., he claims that the information at issue here was not the "subject of efforts to maintain its secrecy." In particular, he notes that some price lists and proposals were disclosed to customers and independent sales reps. He also claims he was generally unaware of any binding confidentiality policy in place at Square D and that much information at issue here was not marked "confidential." Further, the bulk of the information was

15

contained within books or other documents that were not kept in secure locations. Thus, in his view, the information does not qualify as a trade secret under the statute.

Of course, Square D did not need to run its office like a CIA outpost in order to protect its confidential information. All that is required is security that is "reasonable under the circumstances." Wis. Stat. § 134.90(1)(c). While Van Handel has identified some chinks in the security surrounding Square D's confidential information, I do not conclude on that basis alone that Square D has failed to meet its burden. Still, in light of the evidence as a whole, and given the nature of the information it seeks to protect, I do not find that Square D has made such a strong showing on its trade secret claim that preliminary relief is warranted.

Overall, however, I remain skeptical of Square D's claim of irreparable harm. In asserting that a competitor's possession of its pricing information will cause it harm, Square D claims it is still using the exact same information misappropriated by Van Handel. We are now nearly one and one-half years removed from Van Handel's termination and his taking of trade secrets with him. Just as a pitcher and catcher can change their hand signals when they have been picked up by the opposing team, presumably it is within Square D's power to change its pricing information if it believed Van Handel's possession thereof would cause it irreparable harm.[5] Moreover, a fair amount of Square D's trade secrets claim is based on Van Handel's April 7, 2004 memo to Magnetech in which he describes the leads and other opportunities he would bring to Magnetech if hired. Again, if that is the basis of Square D's complaint, the amount of water now under the bridge counsels against a finding of irreparable harm. If Van Handel violated the Trade Secrets Act, the damage has already been done.

---

[5]If not, perhaps because economic forces largely dictated the prices Square D charged, then the information would have been fairly predictable and not subject to trade secret protection at all.

16

By the same token, Square D has difficulty establishing that there is no adequate remedy at law for the alleged trade secret violations. While loss of profits can be difficult to compute, that is true in almost any commercial setting, and injunctive relief in commercial cases is the exception rather than the rule. If it ultimately succeeds on the merits, Square D is entitled to be compensated for Van Handel's misappropriation. In the interim, however, it is difficult to order someone to cease using forbidden knowledge that he has allegedly been using for over a year. Indeed, as Van Handel has admitted, a lot of the information is simply in his head. Thus, the legal remedy (damages) not only exists, but makes more sense under these facts.

### III. CONCLUSION

For the reasons given above, I find that a preliminary injunction would be too drastic a remedy given the general closeness of the case, the time that has passed, and the relative status of the parties involved. Accordingly, the motion for a preliminary injunction is **DENIED**. This matter shall be placed on the court's calendar for a telephone conference for further scheduling.

**SO ORDERED** this   25th   day of August, 2005.

s/ William C. Griesbach<br>
William C. Griesbach<br>
United States District Judge